[Cite as *State ex rel. Friesner v. Abke*, 2025-Ohio-308.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
WOOD COUNTY

State of Ohio ex rel. Donna L. Friesner     Court of Appeals No.  WD-24-005
Trustee of the Donna L. Friesner Trust

     Trial Court No.  2022 CV 0033

     Appellee

v.

Randy C. Abke, et. al.

     Appellees

v.

Board of Commissioners of
Wood County, Ohio, et al.

     Appellants      **DECISION AND JUDGMENT**

     Decided:  January 31, 2025

* * * * *

Matthew D. Harper and Nicholas W. Bartlett, for appellee,
Donna L. Friesner.

Paul A. Dobson, Wood County Prosecuting Attorney and
Assistant Prosecuting Attorneys Linda Holmes and Joyce C. Nowak,
and Teresa L. Grigsby and Jennifer A. McHugh, for appellants.

* * * * *

**MAYLE, J.**

{¶ 1} In this interlocutory appeal, appellants, the Board of Commissioners of

Wood County and the Freedom Township Board of Trustees, appeal the December 13,

2023 judgment of the Wood County Court of Common Pleas, denying their claim of governmental immunity in the action filed against them by appellee, Donna L. Friesner, Trustee of the Trust of Donna L. Friesner, and involuntary plaintiffs, Randy C. Abke and Sandra S. Abke. For the following reasons, we reverse the trial court judgment.

## I. Background

{¶ 2} The Trust of Donna L. Friesner owns real property located at 6535 Kemner Road in Freedom Township, Wood County, Ohio. Randy and Sandra Abke own the neighboring property located at 6391 Kemner Road. Trustee, Donna L. Friesner, filed a petition for writ of mandamus and complaint for other relief against the Wood County Board of Commissioners (the "county" or "commissioners") and the Freedom Township Board of Trustees (the "township" or "trustees") (collectively "appellants"); she named the Abkes involuntary plaintiffs to the action. The crux of the dispute is whether a 608-foot path ("the path") that runs continuously from Kemner Road and ends at Friesner's driveway is a private drive or a public road.[1]

{¶ 3} Friesner contends in her petition and complaint that by virtue of common-law dedication, the path became part of Kemner Road and is a public township road that must be maintained by the township. Her petition and complaint seek judgment (1) declaring that a common-law dedication occurred making the path a public township road; (2) quieting title consistent with its status as a public road; (3) issuing a writ of

---

[1] Friesner calls it a "road." Appellants call it a "private drive." Instead of adopting either party's nomenclature, we will simply call the disputed area a "path."

2.

mandamus compelling the trustees to discharge their legal duties under R.C. 5535.01(C) and 5571.02 to maintain the path and keep it in good repair, and (4) awarding damages arising from the trustees' failure and refusal to maintain the path and keep it in good repair.

{¶ 4} Appellants claim that Kemner Road ends where the path begins, thus the path is a private drive for which they bear no responsibility. They further maintain that under R.C. 2744.02(A)(1), they are statutorily immune from liability for alleged damages resulting from its disrepair.

{¶ 5} Although not argued by either party, the trial court concluded that Kemner Road was dedicated as a public *county* road in 1860, and was extended in 1926, to include the path, but ultimately found that there exists an issue of material fact whether it is currently a public county road or a public township road. Because it determined that either way, the path is part of a public road, it declared it as such. Based on this conclusion, it found that appellants were not statutorily immune from liability because the immunity exception contained in R.C. 2744.02(B)(3) applies, potentially rendering appellants liable for damages arising from loss to person or property caused by the negligent failure to keep the path in repair. It also rejected appellants' claim that even if the path is part of a public road, immunity should be reinstated under R.C. 2744.03(A)(5) because decisions relative to the maintenance of public roads are discretionary. The court held that genuine issues of material fact precluded summary judgment as to the quiet title

3.

claim, the petition for writ of mandamus, and the issue of whether and to what extent

Friesner suffered damages caused by appellants' alleged failure to maintain the road.

{¶ 6} Appellants filed this interlocutory appeal. They assert the following errors

for our review:

> **Assignment of Error No. 1**: The Trial Court's December 13, 2023 Decision and Order denied Defendants' Motion for Summary Judgment on Plaintiffs' damages claim arising from their alleged failure to repair a "public road." The Motion sought dismissal on immunity grounds. The Trial Court erred in allowing Plaintiffs' damages claim to proceed, despite Defendants' assertion that it was barred by the immunity provided them under Ohio R.C. §2744.02(A)(1), based on its erroneous findings that: 1) a "public road" existed; 2) Plaintiffs could invoke the immunity "exception" outlined in Ohio R.C. §2744.02(B)(3) applicable when a plaintiff claims a "loss" "caused by" a "negligent" failure to maintain and repair a "public road," and 3) immunity could not be reinstated under Ohio R.C. §2744.03(A)(5).

> **Assignment of Error No. 2**: As political subdivisions, Defendants are entitled to immunity for tort damages under Ohio R.C. §2744.02(A)(1) unless an immunity exception set forth in Ohio R.C. §2744.02(B) applies. The Trial Court erred in finding the Ohio R.C. §2744.02(B)(3) exception applicable because the exception requires the existence of a "public road," and the record contains evidence disputing each of the three elements required for a common law road dedication, thus creating a genuine issue of material fact. The Trial Court's Decision and Order granting Plaintiff summary judgment finding the existence of a public road and denying Defendants immunity was erroneous.

> **Assignment of Error No. 3**: The Trial Court erred in when it failed to identify or apply the "clear and convincing" proof standard when finding the existence of a public road, which was a predicate ruling to its determination that an immunity exception could be invoked, and its decision to deny Defendants immunity.

**Assignment of Error No. 4**: The Trial Court ruled that "once the decision is made to establish a public road, political subdivisions are not immune from liability for breach of duty to maintain the road." (Dec. and Order p. 17.) This ruling was erroneous because it does not recognize that, in order to invoke the Ohio R.C. §2744.02(B)(3) exception, the Trial Court must have found not only the existence of a "public road," but also have found that the claim for damages was "caused by" a "negligent failure" to keep [the] "public road[...]" in repair. The Trial Court erred in failing to evaluate whether, and to make a finding that, the additional conditions for triggering the immunity exception (i.e. a "negligent failure" to keep the public road in repair and "causation") are present in this case.

**Assignment of Error No. 5:** Assuming that the Ohio R.C. §2744.02(B)(3) exception to immunity applied, the Trial Court erred in failing to reinstate immunity under R.C. §2744.03(A)(5). Decisions made by a political subdivision about whether and when to undertake road repairs are discretionary judgments about the use of public equipment, supplies, materials, personnel, facilities, and other resources. When there is no evidence that discretion was exercised with malicious purpose, in bad faith, or in a wanton or reckless manner, immunity applies.

## II. Standard of Review

{¶ 7} Appellate review of a summary judgment is de novo, *Grafton v. Ohio Edison Co.,* 77 Ohio St.3d 102, 105 (1996), employing the same standard as trial courts. *Lorain Natl. Bank v. Saratoga Apts.,* 61 Ohio App.3d 127, 129 (9th Dist.1989). The motion may be granted only when it is demonstrated:

(1) that there is no genuine issue as to any material fact; (2) that the moving party is entitled to judgment as a matter of law; and (3) that reasonable minds can come to but one conclusion, and that conclusion is adverse to the party against whom the motion for summary judgment is made, who is entitled to have the evidence construed most strongly in his favor. *Harless v. Willis Day Warehousing Co.,* 54 Ohio St.2d 64, 67 (1978), Civ.R. 56(C).

5.

{¶ 8} When seeking summary judgment, a party must specifically delineate the basis upon which the motion is brought, *Mitseff v. Wheeler*, 38 Ohio St.3d 112 (1988), syllabus, and identify those portions of the record that demonstrate the absence of a genuine issue of material fact. *Dresher v. Burt*, 75 Ohio St.3d 280, 293 (1996). When a properly supported motion for summary judgment is made, an adverse party may not rest on mere allegations or denials in the pleadings, but must respond with specific facts showing that there is a genuine issue of material fact. Civ.R. 56(E); *Riley v. Montgomery*, 11 Ohio St.3d 75, 79 (1984). A "material" fact is one which would affect the outcome of the suit under the applicable substantive law. *Russell v. Interim Personnel, Inc.*, 135 Ohio App.3d 301, 304 (6th Dist. 1999); *Needham v. Provident Bank*, 110 Ohio App.3d 817, 826 (8th Dist. 1996), citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

{¶ 9} Generally speaking, "'the issue of whether sovereign immunity is applicable in a particular case is properly determined by a court as a matter of law before trial, and is the proper subject of a summary judgment motion.'" *Vasquez-Cromer v. City of Toledo,* 2019-Ohio-5149, ¶ 8 (6th Dist.), quoting *Grinter v. Toledo*, 1999 WL 740268, *2 (6th Dist. Mar. 19, 1999), citing *Nease v. Med. College Hosp.*, 64 Ohio St.3d 396, 400 (1992). Having said that, genuine issues of material fact may exist as to the applicability of an exception to statutory immunity, precluding resolution of the issue on summary judgment. *Todd v. Cleveland,* 2013-Ohio-101, ¶ 28 (8th Dist.). Our review of a trial

6.

court's rejection of a defense of statutory immunity is de novo. *Piazza v. Cuyahoga Cnty.*, 2019-Ohio-2499, ¶ 33.

### III. Law and Analysis

{¶ 10} In their first assignment of error, appellants argue that the trial court erred in allowing Friesner's damages claim to proceed based on its erroneous findings that (1) the R.C. 2744.02(B)(3) immunity exception applies because the path is a "public road," thus appellants could be liable for loss caused by their negligent failure to keep the public road in repair, and (2) immunity could not be reinstated under R.C. 2744.03(A)(5).

{¶ 11} In their second assignment of error, appellants argue that the trial court erred in finding that the R.C. 2744.02(B)(3) immunity exception applies because the exception requires the existence of a "public road," and the record contains evidence disputing each of the three elements required for a common-law road dedication.

{¶ 12} In their third assignment of error, appellants argue that the trial court erred because in finding the existence of a public road—the predicate ruling to its determination that the R.C. 2744.02(B)(3) immunity exception applied—it failed to apply the "clear and convincing" standard.

{¶ 13} In their fourth assignment of error, appellants argue that the trial court erred by rejecting its immunity defense without finding that there had been a "negligent failure" to keep the "public road" in repair and that this negligence "caused" damages.

{¶ 14} Finally, in their fifth assignment of error, appellants argue that even assuming that the R.C. 2744.02(B)(3) immunity exception applies, the trial court erred in

7.

failing to reinstate immunity under R.C 2744.03(A)(5) based on the discretionary nature of road-repair decisions and the absence of evidence of malicious purpose, bad faith, or wantonness or recklessness.

{¶ 15} Before addressing appellants' assignments of errors, we quickly summarize the legal requirements for common-law dedication of a road, the history of the dispute, and the trial court's findings leading to its conclusion that the path is a public road. And because appellants' assignments of error are multi-faceted and present overlapping issues, we first broadly address the issues presented in their assignments of error, then summarize our resolution of each assignment.

### A. Common-Law Dedication

{¶ 16} Under Ohio law, dedication of a road can be accomplished statutorily or by common-law dedication. *Ickes v. Lawrence Twp.,* 2005-Ohio-3195, ¶ 6 (5th Dist.). Generally, three elements are necessary to accomplish common-law dedication: "(1) the existence of an intention on the part of the owner to make such dedication; (2) an actual offer on the part of the owner, evidenced by some unequivocal act, to make such dedication; and (3) the acceptance of such offer by or on behalf of the public." *Hall v. Dasher,* 2022-Ohio-1735, ¶ 53 (5th Dist.). "The burden of proof to establish a dedication is on the party asserting it." *Bachtel v. Strickland,* 1987 WL 20398, *3 (4th Dist. Nov. 17, 1987).

{¶ 17} The intention to dedicate and acceptance of the dedication may be either express or implied. *Hall* at ¶ 54; *Hawn v. Pleasant,* 1999 WL 366584, *5 (4th Dist. Jun.

8.

1, 1999). Evidence of intention must be clear and convincing. *Becker v. Cox,* 1985 WL 8688, *4 (12th Dist. June 10, 1985). Mere use by the public is not sufficient to satisfy the "acceptance" element for common-law dedication. *State ex rel. Fitzthum v. Turinsky,* 172 Ohio St. 148, 152-153 (1961).

## B. History of the Dispute

{¶ 18} The Friesner farmhouse is one of three homes located on Kemner Road west of where it intersects Caskie Road. It is situated on 72 acres of land. The Portage River borders Kemner Road to the north. Eventually, if the road continued straight, it would meet the river. There is a post at that approximate location, north of the road and west of the Abkes' driveway. Up to the point of the post, the road is relatively smooth and flat. Once past the post, the path is crumbled and uneven. It is mainly broken pavement, stone, and gravel and is heavily rutted and potholed. The Abkes' property line extends beyond the smooth road into the rutted path. Their property must be traversed in order to access the Friesner farmhouse, located west of the Abkes' property.

{¶ 19} Just after the post, the river winds southwest and the path curves in the same direction as the river. They follow each other for a short distance, then the river juts back to the north while the path continues until it dead ends at its intersection with Friesner's driveway. Sometimes when the river overflows, it floods the path. In addition to flooding from the river, a pond located on the Abke property leaks, causing additional dampness near the path.

9.

{¶ 20} Friesner's husband, Todd Friesner, grew up in the Friesner farmhouse, but for more than a decade, Friesner leased the farmhouse and some of the land to the MacAllister family. The bulk of the remaining acreage is used for farming. In around 2015 or 2016, Friesner and the MacAllisters discussed a possible sale of the farmhouse, along with approximately 9.7 acres of the land for $260,000. To accomplish this sale, the parcel would need to be split. Splitting the parcel would require approval of the Wood County Planning Commission and the Engineer's office, and the absence of frontage on a public road is an impediment to obtaining county approval. This split has not occurred and the sale to the MacAllisters was never consummated. But while negotiations were still ongoing, the Friesners secured a formal easement agreement from the Abkes, expressly permitting ingress and egress over their property for purposes of accessing the Friesner property, along with the Abkes' agreement to cooperate in the process of getting the path dedicated as a public road.

{¶ 21} On August 6, 2019, the Friesners sent to the Wood County Administrator a "Request for Formal Confirmation of Prior Acceptance of Dedication Plat." It maintained that a common-law dedication of the path had already been accomplished, but they urged the commissioners to formalize this dedication. In support, they argued that the township had paved, maintained, and snowplowed the path, had contemplated constructing a T-type turnaround on Friesner's property to be utilized by snowplows and other vehicles, and had generally taken the position over many decades that the path was part of Kemner Road. They insisted that the township's maintenance of the path

10.

continued uninterrupted until 2018, when the township abruptly changed course and disclaimed responsibility for the path, declaring that it was a private drive and not a township road.

{¶ 22} The county declined Friesner's request. It disputed that the path had ever been dedicated a township road and explained the numerous reasons—both safety and financial—why dedication of the path "does not meet the county's specifications for new roads," including that the north side of the proposed easement extends ten feet from the water's edge into the Portage River, the river often overflows inundating the path with water six feet deep, there is the potential for river washout, the easement is partially located on the mounding area of the Abkes' leaking pond, and the dedication of the path would not benefit the public given that the only users of the path are the residents and guests of the two homes.

{¶ 23} Friesner filed suit after the county refused to acknowledge that the path had been dedicated and was an extension of Kemner Road. She first filed—then voluntarily dismissed—Wood County case No. 2020-cv-0224. She refiled as Wood County case No. 2022-cv-0333. This is an appeal from the refiled action.

{¶ 24} In the refiled action, Friesner sought judgment (1) declaring that a common-law dedication occurred making the path a public township road; (2) quieting title consistent with its status as a public road; (3) issuing a writ of mandamus compelling the trustees to discharge their legal duties under R.C. 5535.01(C) and 5571.02 to maintain the path and keep it in good repair, and (4) awarding damages. Pertinent to this appeal,

Friesner claimed that she had suffered damages caused by the township's refusal to "maintain" the path as a "road[] within its township" and "keep it in good repair," despite its legal obligation to do so. She maintained that she had been forced to "undertake, at her expense, maintenance and repair" of the path and, because of its deterioration, she "lost a tenant in her house, causing further damages . . . in the form of lost rental income."

## C. The Trial Court Judgment

{¶ 25} The parties filed motions for summary judgment. Appellants moved for summary judgment on all of Friesner's claims. Friesner moved for partial summary judgment on all but her damages claim, the amount of which she maintained must be determined at trial.

{¶ 26} On December 13, 2023, the trial court denied appellants' motion and granted Friesner's partial motion, in part. It concluded that a common-law dedication of the path had taken place and the path is a public road. The court did not resolve Friesner's remaining claims because it found that a genuine issue of material fact exists concerning whether the path is a public *county* road or a public *township* road.

{¶ 27} Pertinent to the present appeal, the trial court also found that a genuine issue of material fact exists concerning whether Friesner has suffered damages related to the failure to maintain the path. On that claim, the court acknowledged—but rejected—appellants' defense that they are statutorily immune from liability for damages under R.C. 2744.02(A)(1).

12.

{¶ 28} Under R.C. 2744.02(A)(1), "[e]xcept as provided in division (B) . . ., a political subdivision is not liable in damages in a civil action for . . . loss to person or property allegedly caused by any act or omission of the political subdivision . . . in connection with a governmental or proprietary function." One of the enumerated exceptions to the immunity granted to political subdivisions is R.C. 2744.02(B)(3), under which a political subdivision may be "liable for . . . loss to person or property caused by their negligent failure to keep public roads in repair. . . ." There are circumstances that may reinstate immunity, including R.C. 2744.03(A)(5), "if the . . . loss to person or property resulted from the exercise of judgment or discretion in determining whether to acquire, or how to use, equipment, supplies, materials, personnel, facilities, and other resources unless the judgment or discretion was exercised with malicious purpose, in bad faith, or in a wanton or reckless manner."

{¶ 29} The trial court found that appellants were not statutorily immune from liability for damages here because the R.C. 2744.02(B)(3) immunity exception applies. This was based on its conclusion that the path is a public road that appellants are obligated to keep in repair. It further rejected appellants' assertion that the decision to maintain and repair a road is discretionary, which they argued reinstated statutory immunity under R.C. 2744.03(A)(5). The court reasoned that the decision to maintain a public road and keep it in repair is mandated by Ohio law and is not discretionary. It found that "once the decision is made to establish a public road, political subdivisions are not immune from liability for breach of the duty to maintain the road."

13.

## D. The Trial Court's Review of the History of Kemner Road

{¶ 30} Despite Friesner's claim that the path is part of Kemner Road, a public *township* road, the trial court found that county records demonstrated that it could be a public *county* road. According to the court's interpretation of the record on summary judgment, a handwritten petition was submitted to the county in 1860, "signed by at least 12 freeholders residing in the vicinity of said proposed road," requesting the establishment of a county road commencing on the section line of Section 29 "where the Rollersville & Portage Road intersects McCutchenville and Perrysburg Road, running West thence along said section line to the Middle Branch of Portage River." Following the notice period, the county appointed viewers to meet with surveyors "to examine the route for a proposed County Road." The viewers reported back "in favor of establishing a *part* of said road on the line surveyed," along with a report and plat. The viewers' reasons for establishing County Road 256 were as follows: (1) "It will accommodate some who now have no convenient road for egress and ingress"; (2) "It will, when made, be of much benefit to the surrounding lands as an outlet for drainage"; and (3) "It will be a general benefit and convenience to the public at large when opened." While the petition requested that the road run west to the Middle Branch of the Portage River, the road, as approved, "terminate[d] at the SW corner of Sec[tion] 29 instead of continuing into the Middle Branch of the Portage River."

{¶ 31} On December 11, 1916, a petition was filed by Kemner-Kreinkamp to improve the road and extend it into Section 31. On March 12, 1926, the county approved

14.

the county surveyor's "Plan for the Kemner-Kreinkamp Road improvement," extending Road No. 256-A into Section 31 in close proximity to the Portage River. It was to be built "from sta. 0+00 to sta. 24+69.85, on the E. & W. branch, on the N. side of Sec[tion] 31."

{¶ 32} The court next summarized maintenance that had been performed in the years that followed. It observed that the April 21, 1947 minutes of the township trustees state that the trustees attended a Wood County Commissioners' meeting "to put in the following roads in the township for new repair, or other words (sic) black top these roads . . . the Kemner road this (sic) being the dead end." In 1947, "KEMNER ROAD – NO 256 A" was "PRIMED PATCHED AND 90# DRAG" for $488.32.

{¶ 33} In a letter to the county commissioners dated June 11, 1970, the Wood County Engineer estimated the cost of $1,025.00 to "patch and surface treat" Kemner Road No. 256-a "[f]rom Caskie Road west to dead end at Portage River. Length 0.57 mile: Width 10 feet: Square yards = 3300." The county and the township agreed that "Kemner Road, No. 256-a, within Freedom Township" would be improved as specified at the cost specified, with the following additional specifications: "Type—bituminous macadam. To be patched and surface treated." The agreement was incorporated into a resolution adopted by the county on July 21, 1970. Further records indicate that the work was performed.

{¶ 34} In a letter to the county commissioners dated April 8, 1974, the Wood County Engineer submitted an estimate of $4,778.67 to resurface Kemner Road No. 256-

15.

a "[f]rom Caskie Road westerly to dead end. Length 0.57 mile: Width 10 feet: Square Yards 3345." The estimate was discussed at a May 6, 1974 township meeting. The minutes from that meeting state "Estimate was received from [t]he County Engineer for the resurfacing of . . . Kenmner (sic) road as follows . . . [Kemner] road from [C]askie [R]d. to dead end 0.57 mile width 10 ft. patch and construction at $4,778.67." The minutes further state that the township would advertise for bids for the repair. Thereafter, a bid from Henry W. Bergman, Inc. was accepted for $4,423,01. Further records indicate that the work was performed.

{¶ 35} And in a letter dated May 11, 1987, from the Wood County Engineer to the county commissioners, the cost for surface treating the entire length of "Kemner Road-No. 256A" was estimated at $4,695.00. The length of Kemner Road was designated as "From U.S. Route 6 to Dead End. Length = 3,364' at 15' width; 2,997' [i.e., 0.567 miles] at 10' width; Square Yards = 8,937." On May 29, 1987, the Wood County Engineer wrote to the county commissioners requesting that an agreement be prepared with the township for the Wood County Engineer to surface treat Kemner Road by force account. On June 2, 1987, the county and the township entered into an agreement for the road to be surface treated "by Wood County forces under the direct supervision and direction of the Wood County Engineer in accordance with the plans, specifications, estimate of cost, etc. thereof as prepared and submitted by the said County Engineer." Further records indicate that the work was performed.

16.

### E. The Trial Court's Resolution of the Question of Common-Law Dedication

{¶ 36} Having reached factual findings concerning the establishment of the path as part of Kemner Road and having found that maintenance was performed on the road, the trial court applied those findings in analyzing the three elements required for common-law dedication.

{¶ 37} As to the first two elements of common-law dedication—intent and offer to dedicate—the trial court concluded that these two elements were satisfied by the petition presented to the county in June of 1860, asking that a county road be established beginning on the section line of Section 29 "where the Rollersville & Portage Road intersects McCutchenville and Perrysburg Road, running West thence along said section line to the Middle Branch of Portage River." While it recognized that the decision had been made initially that County Road 256 would "terminate at the SW corner of Sec[tion] 29 instead of continuing into the Middle Branch of the Portage River," it found that the petition of December 11, 1916, sought to extend the road into Section 31.

{¶ 38} As to the third element—acceptance—the court observed that on March 12, 1926, the county approved the county surveyor's "Plan for the Kemner-Kreinkamp Road improvement," extending Road No. 256-A into Section 31. This, the court held, satisfied the third element—acceptance. But it found that acceptance was further evidenced "by the lengthy history of maintenance of Kemner Road," including the path at issue. It reiterated that such maintenance was performed in 1947, 1970, 1974, and 1987.

17.

{¶ 39} The court concluded that the length of Kemner Road west from Caskie Road was .57 miles, and included the path in its entirety. It reasoned that "[a]s far back as 1970, the Wood County Engineer designated the length of Kemner Road '[f]rom Caskie Road west to dead end at Portage River' as being 0.57 miles." It found that the county and the township relied on this information when they took action to maintain and repair Kemner Road and the path. The court further reasoned that the length of 0.57 miles had been confirmed in the "survey for Kemner Roadway West of Caskie Road Part of Section 31, Town 5 North, Range 12 East, Freedom Township, Wood County, Ohio." It found that that survey shows the total distance from the centerline of the intersection of Caskie Road and Kemner Road to the dead end of Kemner Road as being approximately 3,031 feet, or 0.57 miles, with the path accounting for 608 feet. Based on these conclusions, the trial court determined that a common-law dedication of the path had occurred, rendering it a public road.

### F. The Trial Court's Finding that Questions of Fact Exist

{¶ 40} Although it found that no question of fact existed that Kemner Road, including the path, is a public road, the trial court nevertheless found that questions of fact remained and prevented summary judgment on all of Friesner's claims.

{¶ 41} The court reiterated that County Road No. 256 was established by the commissioners in 1860 as a public county road, and at some point became known as County Road No. 256-A and then Kemner Road. But it observed that there was no explanation in the record for the change in name, and no explanation for how it

18.

purportedly became a township road.  For this reason, the court found that a genuine issue of material fact exists on Friesner's claim to quiet title and for writ of mandamus because it was not clear whether the county or the township had an interest in the path and a duty to maintain it.

{¶ 42} But based on its conclusion that the path is a public road—whether it be a county or township road—the court went on to reject appellants' statutory immunity defense under R.C. 2744.02(B)(3) and declined to reinstate immunity under R.C. 2744.03(B)(5), reasoning that the decision to maintain and keep a public road in repair is not discretionary.

### G. The Parties' Positions Concerning the Elements of Common-Law Dedication

{¶ 43} In their first assignment of error, appellants argue that the trial court incorrectly found that the R.C. 2744.02(B)(3) immunity exception could be invoked based on its erroneous conclusion that the path is a "public road," and immunity could not be reinstated under R.C. 2744.03(A)(5).  They complain that the trial court analyzed the engineering records itself and relied exclusively on its own misinterpretation of the 1916 petition and 1926 Improvement Plan as evidence of the "offer" and "intent" elements of common-law dedication, completely ignoring the testimony of the county engineer and survey coordinator.  They maintain that the "indisputable proof" the trial court relied on actually shows that the path was *not* included in the territory comprising the Kemner Road extension.  Rather, those records show that the 2,469.85-foot extension

19.

of Kemner Road ran on a straight line from Caskie Road due west to the juncture of the Portage River—it did not include the path, which runs southwest from that point across the balance of the Abke parcel and onto the Friesner land. Given this misinterpretation, appellants contend that the court should have examined the other evidence concerning the three elements required for a common-law dedication. They insist that this other evidence creates fact questions precluding summary judgment.

{¶ 44} Friesner does not rely on the trial court's rationale or attempt to justify it as correctly concluding that the 1916 Petition and 1926 Improvement Plan constitute evidence of "offer" and "intent." She does claim, however, that those records demonstrate an intent to dedicate all of Kemner Road as a public road—"[t]hat the course of Kemner Road changed over the intervening decades to match the course of the Portage River is hardly shocking," she reasons. Friesner argues that the 608-foot path begins where the western end of Kemner Road curves southwest, matching the curve of the Portage River and resulting in a southwest hook shape to the path, ending at Friesner's driveway. She maintains that in addition to the express offer to formalize the dedication, made just before they filed suit, the Friesners and Abkes acquiesced to public use of the property, evidencing offer and intent.

{¶ 45} In support of the "acceptance" element, Friesner summarizes at length what she claims is an extensive maintenance history dating back decades and ending only in 2018, when the township abruptly stopped maintaining the path. Her recitation of the maintenance history is substantially more detailed than the trial court's summary.

20.

Friesner also highlights communications from the township and ODOT certifications that she claims acknowledge the status of the path as a public road.

{¶ 46} In reply, appellants maintain that the Friesners and Abkes' silent acquiescence to the use of the path by snowplows, school buses, and mail trucks did not evidence "intent" and "offer" to dedicate, and they insist that the record contains other explanations for why the property owners allowed use of the path. Appellants claim that evidence of the Friesners' efforts to acquire an Easement Agreement and Cooperation Agreement from the Abkes is proof that there was no previous intent to offer to dedicate the path as a public road.

{¶ 47} Appellants also deny that the county accepted the path for dedication, and they emphasize that only the commissioners had authority to accept the dedication. They dispute that the maintenance history demonstrates acceptance. In fact, appellants point to the Friesners' prior complaints to the township about the condition of the path as evidencing that continuous maintenance did not, in fact, occur. And as to the maintenance history, appellants point out that much of the documentation of maintenance is either silent whether it included the path or stopped short of it or can be explained as having been performed for reasons other than that they viewed the path as part of the public road. They submit that the only evidence of acceptance was the performance of some insignificant work on the path in 1970 and 1974. They insist that any major work that was performed on Kemner Road stopped before the path began.

21.

## H. The Trial Court's Faulty Rationale

**{¶ 48}** Despite the trial court's conclusion that the historical records demonstrate that there is no question of fact that Kemner Road, including the path, is a public road, neither party interprets the record consistent with the trial court's interpretation. This is significant as we resolve appellants' first and second assignments of error.

**{¶ 49}** As referenced above, road dedication can occur statutorily or by common-law. *State ex rel. Fitzthum,* 172 Ohio St. at 150. The trial court's decision seems to conflate these two distinct procedures.

**{¶ 50}** R.C. 5553.31 sets forth the statutory procedure for dedicating a road. It provides:

> Any person may, with the approval of the board of county commissioners, dedicate lands for road purposes. A definite description of the lands to be dedicated with a plat of such lands thereto attached and signed by the party dedicating such lands, with the approval and acceptance of the board indorsed thereon, shall be placed upon the proper road records of the county in which such road is situated. The board shall not approve and accept the dedication of any land for road purposes until any lien attached to such land under division (A) of section 505.82 of the Revised Code is satisfied. If the lands so dedicated contemplate a change in an existing road, the same proceedings shall be had thereon, after the board by proper resolution approves and accepts the lands for such purpose, as are provided in cases where the board by unanimous vote declares its intention to locate, establish, widen, straighten, vacate, or change the direction of a road without a petition therefor, but otherwise the proposal to dedicate lands for road purposes, together with the acceptance of the grant by the board, constitutes the lands so dedicated a public road without any further proceedings thereon.

**{¶ 51}** The trial court relied on records from 1860, 1916, and 1926 as satisfying the "intention," "offer," and "acceptance" elements of a *common-law* dedication. But

22.

what the trial court described by reference to these records pertains entirely to the original statutory dedication of lands that would extend Kemner Road past Caskie and up to the juncture of the Portage River. This is problematic for two reasons: (1) as stated, these records are evidence of *statutory* dedication (not common-law dedication); and (2) these records show dedication of Kemner Road only to the point of the river (not into the disputed stretch of pavement that Friesner calls a public road and appellants call a private drive—i.e., what we have referred to as "the path."). The trial court found that these 1860, 1916, and 1926 records provide undisputed evidence of all three elements of a common-law dedication of the path. It found that some of the maintenance history highlighted by Friesner constitutes additional evidence of the third element—acceptance.

{¶ 52} Friesner sought to accomplish statutory dedication of the path in 2019, by a formal offer letter attaching a dedication plat. Appellants declined to accept the plat dedication. Not succeeding in achieving a statutory dedication, Friesner filed suit, attempting to prove that a common-law dedication had already occurred *despite* appellants' rejection of her offer and the failure to dedicate the path statutorily. Because the trial court failed to appreciate that the century-old records did not encompass the path, and by conflating the concepts of statutory and common-law dedication, the trial court did not properly analyze the first two elements of common-law dedication. It also improperly analyzed the third element by finding evidence of "acceptance" in the historic records, however it offered an alternate rationale for finding that "acceptance" was satisfied, so this is less problematic.

23.

**{¶ 53}** Given that our review here is de novo, and a de novo review of a summary-judgment motion permits us to affirm a trial court judgment even if we find that the trial court reached the correct conclusion albeit for different reasons, we will examine the record and the parties' arguments to determine if the correct result was reached despite the trial court's faulty rationale. *Bonner v. Delp,* 2021-Ohio-3772, ¶ 80 (6th Dist.), *Singer v. Fairborn*, 73 Ohio App.3d 809, 814 (2d Dist. 1991).

## I. Evidence Concerning Common-Law Dedication

**{¶ 54}** As previously articulated, common-law dedication requires clear evidence of three elements: (1) intention to dedicate, (2) an offer to dedicate, and (3) acceptance of the dedication. *Becker*, 1985 WL 8688, at *4 (12th Dist.). There is much overlap between these elements. For instance, "intention" and "offer" to make a dedication often may be inferred from the same evidence. *Mastera v. City of Alliance.,* 43 Ohio App.3d 120, 121 (5th Dist. 1987). So, too, may the elements of "intention" and "acceptance." *See Bachtel,* 1987 WL 20398, at *3 (4th Dist.) ("A dedication and acceptance of private property for a public use may result from the use of such property by the public, with the silent acquiescence of the owner, for a period of time sufficient to warrant an inference of an intention to make such dedication and to constitute such acceptance.").

**{¶ 55}** We examine the evidence asserted by the parties in their motions for summary judgment as they relate to the elements of common-law dedication.

24.

### 1. Intention and Offer

{¶ 56} Friesner suggests that despite the trial court's failure to look outside the historic documents for evidence of "intention" and "offer," its analysis of these elements need not be wholly disregarded because, she maintains, the historic documents still provide proof of the elements of common-law dedication. This is based on her claim that "[t]he 1916 and 1926 documents reveal the then-property owners' *express intent to dedicate all of Kemner Road as a public road.*" Friesner contends that the course of Kemner Road simply "changed over the intervening decades to match the course of the Portage River." Appellants point out that there is no record evidence to support this assertion, and, in any event, the path winds *away* from the river—it doesn't follow the course of the river.

{¶ 57} Friesner also maintains that the status of the path as a public road is supported by testimony from Todd Friesner, who recalled from his childhood that members of the public used the path to access the Portage River for fishing, and he recalled school buses, mail trucks, and delivery drivers using the path. Appellants, on the other hand, offered evidence that neither the Abkes nor the MacAllisters, who leased the farmhouse for a decade, ever saw people use the path to go fishing. Randy Abke testified that when his sisters were younger, a school bus picked them up and backed into their driveway to exit Kemner Road, rather than driving down to the Friesner property to turn around, and the MacAllisters generally did not see school buses drive down the path.

25.

Even so, appellants claim, school buses are authorized by statute to use private property as a turnaround point.

{¶ 58} Appellants also urge that Friesner's current claim that the path is part of a public road is at odds with its conduct in securing an access easement and cooperation agreement with the Abkes and is at odds with 2016 discussions with the county about the possible acquisition of an easement to facilitate a turnaround on Friesner's property. Additionally, they claim that the Abkes, involuntary plaintiffs here, did not genuinely intend to dedicate their property to appellants.

{¶ 59} "Intention" and "offer" to make a dedication may be express or implied and may be supported by evidence of "the use of the property by the public, with the mere silent acquiescence therein of the owner, for a period sufficient to warrant the inference of an intention to dedicate, provided that the owner should have had knowledge of the fact of such use." *Mastera,* 43 Ohio App.3d at 121. *Id.* Nevertheless, "public use which is not inconsistent with the owner's use and enjoyment of his rights of private ownership will not demonstrate intention to dedicate." *Id.* "Thus, if a roadway is maintained by an owner for his private use, and it is also used incidentally by the public, only a permissive use is presumed (regardless how long the public use)." *Id.*

{¶ 60} Here, we find no evidence of an "express intent to dedicate all of Kemner Road as a public road." As for use of the path by the public, this is at best a disputed issue. There *is* evidence that the Friesners and Abkes believed the path to be part of the public road, but there is also evidence that the MacAllisters paid for and performed their

26.

own patching of potholes, Todd Friesner sometimes dropped off stone for filling potholes, and when appellants actually filled in potholes, they did so after the MacAllisters complained that the township snowplows caused the damage in the first place by using the Friesner driveway as a turnaround. Additionally, there is evidence that Friesner engaged in discussions with both the Abkes and the county concerning acquiring easements, suggesting that they believed that the path was private property. This competing evidence demonstrates that genuine issues of material fact exist as to the elements of "intention" and "offer."

### 2. Acceptance

{¶ 61} Formal acceptance is not required to effectuate a common-law dedication. *Mastera*, 43 Ohio App.3d at 121-22. Acceptance may also be established, for instance, by the act of a governmental authority in improving the road. *Id.* Mere use by the public, however, "without an acceptance by responsible public authorities, is not sufficient to charge those authorities with the duty of maintenance." *State ex rel. Fitzthum*, 172 Ohio St. at 152.

{¶ 62} In *Fitzthum*, the Ohio Supreme Court acknowledged that "a negligent violation of the duty to maintain streets which it is obligated to maintain imposes on a board of trustees liability for damages suffered by anyone as a result thereof." *Id.* at 152. To that end, it reasoned that "some acceptance of the responsibility and consequent potential liability should be required prior to imposing such responsibility and liability through the unilateral act of a person or group of persons who decide to dedicate their

27.

land for the use by the public as roads or streets." *Id.* Moreover, it acknowledged the burden and expense required to maintain modern roads. It observed that "maintenance of streets and roads today entails much more than the mere dragging and spreading of a little gravel which was sufficient to accommodate the horse and buggy travel of a generation or so ago." *Id.* Particularly significant to the present case, the court recognized that "[t]o impose such a duty might well subject township trustees to the responsibility of improving and maintaining many of the country lanes leading only to a single farmhouse merely because deliverymen, mailmen and other segments of the public have been using that lane for a period of years." *Id. See also Becker*, 1985 WL 8688 at *5 (12th Dist.) (concluding that there was an absence of continuous public use required for common-law acceptance and observing that "[t]hose individuals who did use the driveway on a regular basis were those who either resided on [the road] or had farm land in the area").

{¶ 63} Appellants offered affidavits from numerous township and county employees and officials concerning the status of the path as it relates to Kemner Road. The affiants are all consistent in their understanding that the dedicated Kemner Road ends in the vicinity of a marker post. Ryan Crum, the Surveys Operations Coordinator and Assistant Tax Map Draftsman for Wood County, stated more specifically that the road terminates at the Middle Branch of the Portage River. He averred that Kemner Road, from Caskie Road to where Kemner dead ends at the Portage River, is 0.47 miles. The path is 0.10 miles.

28.

{¶ 64} In the affidavits offered by appellants, witnesses familiar with maintenance of the road explain that snowplows routinely plowed to the end of the path because they used Friesner's driveway as a turnaround. This was because turning around at the end of the dedicated road was too dangerous due to the proximity of the river. As an accommodation for Friesner allowing the snowplows to turn around in her driveway, snowplow operators would leave the blade of the plow in the down position as they traveled to the turnaround. And because the plows caused wear and tear of the path, they sometimes filled potholes on the path, especially when Friesner or her tenant complained about them. But those witnesses averred that they never performed cold patch repair, did not mow along the sides of the path, and did not perform berm repairs as would have been performed on township roads.

{¶ 65} Appellants' witnesses claimed that the only major road project performed on Kemner Road was a 2018 repaving project. They obtained two estimates for that work—one that included only Kemner Road to the marker post, and the other to the end of the path. While both estimates were obtained, appellants claim that they never intended to pay the cost to have the path repaved. Rather, they obtained this estimate to give to Friesner because they believed it might be less expensive for Friesner to have the path repaved at the same time appellants had the road repaved.

{¶ 66} Friesner, on the other hand, claims that township records make clear that appellants have always considered Kemner Road to extend to the end of the path. They

29.

point to (a) maintenance records, (b) certifications to the Ohio Department of Transportation, and (c) correspondence acknowledging the path as part of Kemner Road.

### a. Maintenance Records

{¶ 67} Friesner's contentions concerning the maintenance history are summarized below, along with appellants' explanations for why this activity does not demonstrate that they accepted responsibility for keeping the path in repair.

| Year | Friesner's Contentions | Appellants' Response |
|------|------------------------|----------------------|
| 1947 | Township records confirm that Kemner Road is "a dead end road," and was to be blacktopped that year. | The records state only that Kemner Road "dead-ends." They do not identify the location of the dead end or the length of the work. The county engineer testified that the road dead-ends west of the Caskie Road intersection, in the vicinity of a marker post located in the right-of-way. Work performed to the "dead-end" would not include the path. |
| 1952 | Township records show that a truck driver "was instructed to fix catch basin along Charlie Abke farm on the Kemmer [sic] road in the near future." The "catch basin" is located adjacent to the south side of the path, west of where appellants contend Kemner Road ends. | The county engineer survey operations coordinator testified that the catch basin is located to the west of the marker post, but still within the right-of-way of the formally dedicated Kemner Road. |
| 1960 | A company called Bell & Clark was paid $511.40 for "[o]iling Sander and Kemmener [sic] Rd." | Just because Kemner Road was "oiled" does not mean that Kemner Road included the path or that this portion of pavement was actually repaired by the township. The records do not identify the length of the project or demonstrate that the oiling work included the path. |
| 1969 | The Township's "Truck Driver was instructed to repair ... Kemner ... road | The records do not indicate that Kemner Road included the path, and |

30.

| | | |
|---|---|---|
| | in the next two weeks." Records confirm that Kemner Road was "oiled." | they are silent as to its length and starting and ending points. |
| 1970 | The township scheduled Kemner Road to receive new black top. An estimate was sought "to patch, tar and chip" Kemner Road "from S.R. 6 to Caskie Road, to end." The engineer provided an estimate to the county for the requested work, "From Caskie Road west to dead end at Portage River. Length 0.57 mile." The township's minutes authorized an agreement with the county "to resurface Kemner road at the estimate of $1025.00." County records confirm the township paid the engineer $1,025 for the work on the 0.57 mile stretch of Kemner Road west of Caskie Road. The records confirm that the workers "patched and surface treated [Kemner Road] from Caskie Road to dead end" for $1,025.50. The specified distance of Kemner Road as being 0.57 miles westerly from Caskie Road is highly relevant because that distance exactly encompasses the entirety of the path. Friesner obtained a professional survey from Bryan Ellis, who confirmed that the total distance from the centerline of the intersection of Caskie and Kemner Roads to the driveway of the Friesner family homestead is 0.57 miles. | The county entered into an Agreement with the township for Kemner Road improvement work "[f]rom Caskie Road west to dead end at Portage River." The cost estimate that was obtained was for work to be performed "from Caskie Road west to dead end at Portage River." The documents show that the county approved work that ended at the juncture with the Portage River. While Friesner submits that the ultimate length of the work—0.57 miles—equates to a distance that includes the path, plaintiffs maintain that if this is true, this means only that the documents are internally inconsistent. They point to Crum's affidavit, indicating that the reference in the 1970s document to the project length is "inconsistent with the previous road records and other private surveys which establish the distance from Caskie Road to the dead end at the Portage River as being 0.47 miles, not the 0.57 miles as stated in the agreement." Appellants maintain that these are internal inconsistencies and not evidence of an implied acceptance by the commissioners to extend Kemner past the dead-end at the River. |
| 1974 | The Township agreed to use "revenue sharing monies for new tops on the Stein, Kemner, and Kesson road." County records describe the work on Kemner Road to extend "[f]rom Caskie Road westerly to dead end Length 0.57 | Appellants maintain that there is no explanation in the record for why this work was performed. Moreover, they contend that the mere existence of the work is not evidence that it was performed because the appropriate |

31.

| | | |
|---|---|---|
| | miles." The engineer also provided estimates for work on Kemner Road "from Caskie Road westerly to dead end. Length 0.57 mile." The engineer estimated that the work "from caskie rd. to dead end 0.57 mile" would cost $4,778.67. A bid was accepted for $4,423.01. The actual total charged and paid was $4,797.50. Todd Friesner lived at the family homestead in 1974 and recalls the work done on the path in 1974, because the asphalt and gravel top for the road made it difficult for him to ride his bike. He also recalls the tar truck backing all the way up to the driveway. | governmental officials accepted and viewed the path as part of a dedicated road. |
| 1987 | The Township asked the County Engineer to prepare an estimate for the county to perform surface treating work on Kemner Road "to dead end, West of Caskie Road." This work was completed. | The records indicate that the work would extend "from US 6 [not Caskie Road] to dead-end." The records do not identify the precise point on US 6 where the work would start, the precise location of the "dead-end," or the length of the pavement as starting at Caskie Road and ending at the Friesner farmhouse. There is no record evidence that the county commissioners were ever informed that 0.57 miles was a length that included the path, nor was there evidence that any commissioner calculated the distance when they approved the agreement for the work. The township minutes asked the county engineer to estimate the cost of surface treating Kemner Road "to the dead end, west of Caskie Road." The records do not reflect that the trustees understood the dead-end to be something other than the general area of the marker post at the juncture of the river. Also, the payment issued |

32.

| | | for the work was less than the amount agreed upon, suggesting that the county ultimately did not perform all of the work originally contemplated by the Agreement. |
|------|-----------------------------------------------|-------------------------------------------------|
| 1992 | Township minutes confirm that Kemner Road was "moto paved" from its west end for a distance eastward of 500 feet. | The records show only that an estimate was sought, but do not indicate that the work was actually performed. Even if the work was performed, the records do not show where the "west end" started or that it included the path. |
| 1994 | Work was attempted on the catch basin located in the path west of the purported end of the road, but could not be done as the basin was continually filled with water. | The records do not show that work was completed, and the catch basin is located within the dedicated Kemner Road easement, outside the path. |
| 2001 | The Township considered an estimate to "[s]urface treat the west 1000' of [Kemner Road] roadway," which would have included the path since it is located within the west 1000' of Kemner Road. That work was ultimately performed. Todd Friesner personally viewed the work and said that it started at the driveway of the Friesner family homestead. He also recalled complaining to the township because his tenant was not pleased with the work that was performed. | The records refer to pavement work that was considered for the west 1000 feet of Kemner Road, but do not define where that point starts. |
| 2015 | Todd Friesner or his tenant complained about potholes on the path. The township repaired potholes that same month. | Appellants concede that some potholes on the path were filled with crushed stone in 2015, after MacAllister raised concerns. The MacAllisters believed that because township snowplows used the path to make turns and were responsible for creating the potholes, the township should remedy the problem. In any event, this evidence is irrelevant because only the county |

33.

| | | | |
|---|---|---|---|
| | | | commissioners—not the trustees—are authorized to accept the path as a public road. |
| 2016 | Todd Friesner and the trustees discussed a potential turnaround on Friesner's property and weighed the relative benefits of various turnaround types and locations.  Counsel for the trustees sent an email on October 13 to Friesner's counsel stating: "I left you a voice mail message earlier but here is a preliminary view of the easement for the Friesner (sic) with the turnaround at the property line.  That would give the house some privacy.  If we go back to the house with the easement, it would also have to include an area for a turnaround that would intrude into the front yard and driveway to the house. We need to know by tomorrow which option you choose because the township needs to pave the road before the asphalt plants close for the winter." The prior voice mail referenced the need for the turnaround to accommodate snowplows and school buses. These communications show that the trustees desired to formalize an easement to accommodate the turnaround at the Friesners' driveway—not at the marker post.  It also shows that they contemplated paving the path all the way to Friesner's driveway. | | This email indicates merely that one proposal for an easement to accommodate a turnaround would be to locate it at the property line of the Abke and Friesner parcels.  But as the email says, the trustees were contemplating the acquisition of an easement in order to install the turnaround.  There would be no need to acquire an easement if Kemner Road as a public road already extended past the juncture of the Portage River, and extended fully to the farmhouse. |
| Pre-2018 | Randy Abke testified that sometime before 2018, the trustees undertook backhoe excavating activities on the catch basin adjacent to the path, west of the marker post.  When Abke complained about the work being done, a township worker told him "we got | | |

34.

| | | |
|---|---|---|
| | right of way, we, you know, we can do what we please." | |
| 2018 | Appellants suddenly refused to pave the path. Kemner Road was paved, but this improvement stopped at the marker post and provided no turnaround for maintenance or other vehicles. The path became impassable, forcing the Friesners' tenant to repair it themselves. Friesner was forced to obtain an easement from the Abkes. | Appellants agree that repavement of Kemner Road ended at the road's juncture with the Portage River, before reaching the Friesner property line. |

### b. Certifications to ODOT

{¶ 68} Friesner argues that in addition to decades of maintaining the path, appellants signed and submitted certifications of the length of county and township roads to ODOT. She argues that based on these certifications, ODOT issued its Road Inventory System ("RIS") Report identifying all of the public roads in the township and stating that the west end of Kemner Road is .5680 miles long from Caskie Road to its western terminus, a length which includes the path. She insists that having certified that the county and township roads include the path, appellants cannot now deny it.

{¶ 69} Appellants respond that the certification forms signed by the commissioners and the trustees are not specific to Kemner Road and do not certify that Kemner Road includes the path—they show only the total mileage of public roads that the county or township is responsible for maintaining. Appellants offered affidavits explaining that the certification forms are sent by ODOT to the county engineer's office with each township's total road mileage already typed into the form. Those forms are forwarded to township trustees with instructions to sign and return them. The township is

35.

not asked to verify the accuracy of the total mileage or determine what portion of the total mileage is attributable to any particular road or segment—the township lacks the resources to do this. Rather, the township relies on the figures supplied by ODOT and simply carries them over unless additional roads have been added by new plats or annexation.

{¶ 70} To the extent that Friesner argues that the ODOT RIS Report indicates that the total length of the west section of Kemner Road is .57 miles—which Friesner says equates with inclusion of the path as part of Kemner Road—appellants respond that the RIS Report is not created, maintained, or signed by Wood County or Freedom Township officials. Moreover, they claim that Friesner presented no testimony identifying the source of the information in the RIS Report or explaining if the numbers are even based on actual survey data. Appellants insist that the certifications cannot be relied upon in determining if there has been an "implied acceptance" of the path as a public road.

### c. 2014 Correspondence

{¶ 71} Friesner also points to 2014 correspondence from the township as evidencing its acknowledgment that Kemner Road includes the path. In letters dated February 11, 2014, the trustees wrote to Friesner and her tenant, advising them that parked vehicles on the property had interfered with snow removal efforts. The letter to Friesner stated "As you are aware, Kemner Road dead ends into your property and in order for the township's snow plows to get turned around without getting off the road, they must use your driveway." The letter to the tenants complained that the township

36.

was forced "to deal with parked vehicles located at the west end of Kemner Road that dead ends into your driveway." The letters reference the township's duty to plow the road. Friesner contends that the trustees plainly admitted that they have a duty to maintain all of Kemner Road, including the path. Friesner also points out that Randy Abke testified that he "never had any reason to believe the road ended anywhere other than the dead end at the Friesner property."

{¶ 72} Appellants concede that these letters expressed their concern that vehicles had been parked at the "end of the road," requiring snowplow drivers to turn around in the yard or back out. They emphasize, however, that two trustees signed affidavits explaining that it was not their intention when signing the letter to suggest that the path is part of Kemner Road or that Kemner Road extends onto Friesner's land. They acknowledge that the letter would have been more accurate if it said that Kemner Road ends before reaching the Friesner property, however, the focus and intent of the letters was to solicit the assistance of the tenants living in the Friesner farmhouse—not to describe Kemner Road.

{¶ 73} In *Ickes*, 2005-Ohio-3195, at ¶ 16 (5th Dist.), the Fifth District recognized that the issue of implied acceptance necessary to prove common-law dedication "[i]s not a purely legal analysis," but rather one requiring the facts to be weighed to determine whether sufficient evidence exists to demonstrate implied acceptance. There, the trial court had held that "formal" acceptance had not been demonstrated even though the stipulated facts showed that the roadway had been part of the township's lighting district,

37.

had been subject to assessments for the lighting district, was included in ODOT's street inventory as part of a dedicated street, and was used by members of the public. The appellate court remanded the matter to the trial court for consideration by the fact-finder whether *implied* acceptance had been proven.

{¶ 74} We similarly conclude that the evidence offered by the parties demonstrates that there exist genuine issues of material fact concerning the element of "acceptance." It is unclear whether much of the maintenance that was performed actually extended past the marker post at the juncture of Kemner Road and the Portage River. To the extent that some maintenance of the path occurred, it is unclear whether appellants performed this maintenance because they believed they were duty-bound to do so or as an acknowledgment that they had damaged the path by using it as a turnaround for its snowplows. As for the ODOT certifications and the 2014 letters to Friesner and her tenant, this evidence must be weighed along with the maintenance evidence in determining whether they signify appellants' implied acceptance of a dedication. *See State ex rel. Schmardebeck v. Bay Tp. Bd. of Trustees,* 1993 WL 553607, *3 (6th Dist. Dec. 30, 1993) (affirming denial of appellants' motion for summary judgment and acknowledging that while there had been an admission that the township improved the road at issue, "appellee had submitted conflicting affidavits which, at best, would have created a question of fact" precluding summary judgment in appellant's favor); *Village of Boston Hts. v. Village of Boston Hts*., 1981 WL 4209, *2 (9th Dist. Oct. 21, 1981) (finding genuine issue of material fact whether village accepted offer to dedicate where it

38.

spread oil on the road three times over 12-year period, plowed snow, collected rubbish, sprayed for mosquitoes, erected NO OUTLET, NO THROUGH STREET, and CHILDREN AT PLAY signs, placed stop sign at intersection, and installed street name sign).

{¶ 75} Should the trial court conclude after further proceedings that common-law dedication of the path occurred here such that the path is a "public road," it must also determine whether Friesner suffered "loss" that was "caused by" the "negligent" failure to keep the public road "in repair." In sum, there exist genuine issues of material fact whether the immunity exception contained in R.C. 2744.02(B)(3) applies. *See Hubbell v. City of Xenia*, 2007-Ohio-4839, ¶ 21 ("If a genuine issue of material fact remains, the court of appeals can remand the case to the trial court for further development of the facts necessary to resolve the immunity issue.").

## J. Reinstating Immunity

{¶ 76} There are three tiers in cases involving political subdivision immunity. The first tier is "the general rule that a political subdivision is immune from liability incurred in performing either a governmental function or proprietary function." *Pelletier v. Campbell*, 2018-Ohio-2121, ¶ 15, citing R.C. 2744.02(B). The second tier involves determining if any of the five exceptions in R.C. 2744.02(B) apply "to expose the political subdivision to liability." *Id.* The burden of demonstrating the applicability of an exception to the general grant of immunity lies with the plaintiff. *Nonprasit v. Ohio Teaching Family Assn.,* 2022-Ohio-3685, ¶ 43 (6th Dist.). If any of the exceptions apply,

39.

the third tier requires the court to determine if immunity may be reinstated under one of the defenses set forth in R.C. 2744.03. *Pelletier* at ¶ 15. In their fifth assignment of error, appellants challenge the trial court's determination that immunity could not be reinstated under R.C. 2744.03(A)(5). They maintain that a genuine issue of material fact exists concerning whether the "failure to repair" involved a discretionary decision about the use of public resources exercised in good faith—especially given that the alleged "loss" here was not in the form of physical injury.

{¶ 77} We conclude that until the trial court reconsiders whether the immunity exception applies, it is premature for this court to pass upon the trial court's conclusion that immunity could not be reinstated under R.C. 2744.03(A)(5).

## K. Resolution of the Assignments of Error

{¶ 78} In the preceding sections, we broadly addressed the issues presented in appellants' assignments of error. Because their assignments of error are multi-faceted and present overlapping issues, we summarize our resolution of the assignments of error.

{¶ 79} We find appellants' first assignment of error well-taken, in part. We agree with appellants that the trial court erroneously concluded that no genuine issue of material fact exists concerning whether the R.C. 2744.02(B)(3) immunity exception applies. There is, in fact, a genuine issue of material fact concerning the application of R.C. 2744.02(B)(3). However, we decline to address the trial court's conclusion that if the R.C. 2744.02(B)(3) immunity exception applies, immunity may not be reinstated under R.C. 2744.03(A)(5).

40.

{¶ 80} We find appellants' second assignment of error well-taken. We agree with appellants that genuine issues of material fact exist as to all three elements of common-law dedication, therefore, precluding summary judgment.

{¶ 81} We find appellants' third assignment of error well-taken, in part, and not well-taken, in part. We agree with appellants that an intention to dedicate must be demonstrated by clear and convincing evidence; the trial court judgment does not acknowledge this standard of proof. We disagree, however, that offer and acceptance must be established by clear and convincing evidence. All the cases cited by appellants speak of this elevated standard of proof only with respect to the "intention" element. *See State ex rel. Mentor Lagoons, Inc. v. Wyant,* 166 Ohio St. 169, 171 (1957) ("The owner's intention to dedicate property to public use as a highway must be established by clear evidence."); *Hall,* 2022-Ohio-1735, at ¶ 54 (5th Dist.) ("The evidence showing an intent to dedicate must be clear and convincing."); *Becker*, 1985 WL 8688, at *4 ("[T]he evidence showing an intention to dedicate must be clear and convincing evidence.").

{¶ 82} We find appellants' fourth assignment of error well-taken. The trial court held that "a genuine issue of material fact exists for trial regarding whether Friesner has suffered damages related to the failure to maintain the [path]." While Friesner's claim for damages and the requirements for invoking an exception to statutory immunity are very much intertwined, the tiered analysis for claims of statutory immunity requires consideration of issues in a particular order. To that end, Friesner's damages claim cannot proceed unless she demonstrates the applicability of the immunity exception.

41.

That is, she must demonstrate not only that the path is a "public road," but also that she suffered "loss" "caused by" the "negligent failure" to keep the "public road" "in repair."

{¶ 83} We decline to address appellants' fifth assignment of error. We conclude that until the trial court reconsiders whether the immunity exception applies, it is premature for this court to pass upon the trial court's conclusion that immunity could not be reinstated under R.C. 2744.03(A)(5).

{¶ 84} Finally, we are cognizant that our resolution of appellants' assignments of error impact the trial court's non-final judgment respecting Friesner's declaratory judgment claim. The trial court will have to reconcile its prior judgment with this court's decision.

## IV. Conclusion

{¶ 85} For the reasons set forth in the preceding sections, we find that factual disputes exist as to all elements of common-law dedication, thus whether the path is a "public road" under the R.C. 2744.02(B)(3) immunity exception (and all other elements of the immunity exception) present fact questions for the trial court to resolve. Accordingly, we find appellants' first assignment of error well-taken, in part. We find appellants' second assignment of error well-taken. We find appellants' third assignment of error well-taken, in part, and not well-taken, in part. We find appellants' fourth assignment of error well-taken. And we decline to address appellants' fifth assignment of error.

42.

{¶ 86} We reverse the December 13, 2023 judgment of the Wood County Court of Common Pleas and remand this matter to the trial court for further proceedings to resolve the factual issues relative to each of the elements of the immunity exception contained in R.C. 2744.02(B)(3) and to fully determine its applicability.  As Friesner's claims here will be tried to the bench, and there is much overlap between the issues presented by appellants' immunity defense and Friesner's claims, the court may exercise its discretion whether to hear the immunity defense and try Friesner's claims in a single evidentiary proceeding rather than conduct a separate hearing and bench trial.  Friesner is ordered to pay the costs of this appeal under App.R. 24.

Judgment reversed<br>
and remanded.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27.
*See also* 6th Dist.Loc.App.R. 4.


Thomas J. Osowik, J.           _____
                                                 JUDGE
Christine E. Mayle, J.

Gene A. Zmuda, J.             _____
CONCUR.                                              JUDGE

_____
                                                 JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions.  Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.